685 So.2d 923 (1996)
The FLORIDA STATE UNIVERSITY, Appellant,
v.
D. Paul SONDEL, Appellee.
No. 94-4330.
District Court of Appeal of Florida, First District.
December 17, 1996.
Rehearing Denied January 30, 1997.
*924 Gerald B. Jaski, General Counsel; Robert B. Jurand, Associate General Counsel, The Florida State University, Tallahassee, for Appellant.
Jerry G. Traynham of Patterson & Traynham, Tallahassee, for Appellee.
SMITH, Senior Judge.
Florida State University (FSU) appeals from a final order of the Florida Commission on Human Relations (Commission) finding that FSU unlawfully discriminated against Appellee D. Paul Sondel (Sondel) by refusing to employ him because of his age. Sondel has cross-appealed the Commission's failure to award back pay and emoluments of employment, and the Commission's failure to award attorney's fees. We reverse on the appeal and, accordingly, find it unnecessary to rule on the cross-appeal.
In June 1992, FSU advertised an employment opening for Resident Housing Coordinator, a position involving administrative and managerial duties in connection with the operation of one of FSU's fourteen on-campus residential halls housing 400 to 600 students. The resident housing coordinator selects, trains and supervises student housing assistants, acts as chief judicial officer of the building, and administers justice for housing infractions. The coordinator also oversees developmental programming, is responsible for the student activity budget, assists in researching information on student residents, and coordinates certain central office functions.
The advertisement for the position stated the qualifications as being a master's degree in an appropriate area of specialization, or a bachelor's degree in an appropriate area of specialization with two years of appropriate experience. The advertisement also stated that a master's degree and university housing experience was essential. It further described the position as a "live-in" position administering housing units for approximately 400 to 600 students.
*925 Sondel, who was 63 years of age at the time, applied for but was not selected to fill the position. The evidence before the hearing officer revealed that the coordinator for FSU's University Relations, Employment and Recruitment Office reviewed the applications for the position and forwarded the thirteen applications meeting the minimum requirements of the positionSondel's being among thoseto the housing office for review by Ms. Phyllis McCluskey-Titus, FSU's Associate Director of University Housing. McCluskey-Titus selected two applicants for telephone interviews. She then granted a personal interview with one of those, Ms. Sara Steyer, 24 years of age, whom she hired for the position. Of the thirteen applicants, only Sondel and one other person were over the age of 40; neither received a telephone call or a personal interview.
Upon receipt of Sondel's petition alleging age discrimination, the Commission initiated an investigation which resulted in a determination of no cause. Sondel's request for a formal hearing was received by the Commission and forwarded to the Division of Administrative Hearings (DOAH). Following an evidentiary hearing, the hearing officer rendered his recommended order finding FSU guilty of age discrimination in violation of the Florida Human Rights Act, sections 760.01-760.10, Florida Statutes,[1] and more specifically, the provisions of section 760.10 relating to unlawful employment practices. The hearing officer's recommended order directed FSU to cease from its discriminatory activities, and further directed FSU to place Sondel in the position as Resident Housing Coordinator. The Commission agreed with the hearing officer's findings of fact, conclusions of law, and recommendation, and entered its final order requiring FSU to place Sondel in the position as coordinator. This appeal followed.
On appeal, FSU contends that the record does not contain competent, substantial evidence to support a finding of age discrimination upon any theory cognizable under the applicable law. FSU asserts that Sondel based his complaint upon a theory of "disparate treatment" on the basis of age, but that he wholly failed to carry the ultimate burden of demonstrating that he was a victim of intentional discrimination, or that his age was a motivating or determining factor in FSU's decision to hire another applicant. FSU contends that the hearing officer's recommended order failed to make any finding that Sondel's age was a motivating or determinative factor in its failure to hire him, or that FSU intentionally discriminated against Sondel because of his age. FSU emphasizes, among other things, the absence of a finding by the hearing officer that the reasons articulated by FSU for its hiring decision were "pretextual," and that the order, which was accepted by the Commission, is therefore lacking in findings essential to the granting of relief in a disparate treatment case.
FSU further argues that the hearing officer, and the Commission, improperly based their analysis and decision upon a "disparate impact" theory of liability without adhering to the legal standards applicable to that theory, and that the evidence does not warrant the granting of relief under the disparate impact standard.
In response, Sondel argues that he presented a prima facie case, as found by the hearing officer, following which he presented evidence to meet his burden of production as required by applicable case law. He maintains that the hearing officer properly decided the issue of discrimination despite FSU's articulation of legitimate, nondiscriminatory reasons for the hiring decision, because the evidence established that FSU's actions were motivated by a discriminatory predisposition on the part of the hiring official to select a young person for the job. Sondel maintains that the hearing officer analyzed the case under both disparate treatment and disparate impact standards, and that the evidence *926 justifies the relief granted under either theory.
The general purposes of the Florida Civil Rights Act of 1992, as stated in section 760.01(2), Florida Statutes, are
to secure for all individuals within the state freedom from discrimination because of race, color, religion, sex, national origin, age, handicap, or marital status and thereby to protect their interest in personal dignity, to make available to the state their full productive capacities, to secure the state against domestic strife and unrest, to preserve the public safety, health, and general welfare, and to promote the interests, rights, and privileges of individuals within the state.
Section 760.01(3) provides that the Florida Civil Rights Act shall be construed according to the fair import of its terms, "and shall be liberally construed to further the general purposes stated in this section and the special purposes of the particular provision involved." Section 760.10, entitled "Unlawful employment practices," so far as it is pertinent here, provides in subsection (1)(a) as follows:
(1) It is an unlawful employment practice for an employer:
(a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's... age....
Subparagraph (b) of subsection (1) provides that it is unlawful to "limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities,... because of such individual's... age...." The statute further provides in subsection (8)(a) that notwithstanding any other provision of the section, it is not an unlawful employment practice for an employer to take or fail to take any action on the basis of age in those certain instances in which age is "a bona fide occupational qualification reasonably necessary for the performance of the particular employment to which such action or inaction is related."

I.
We agree with FSU's contention that the hearing officer analyzed the burden of proof requirements of this case under standards applicable to cases presented under the disparate treatment theory, and that the factual findings contained in the recommended order, which were accepted by the Commission in their entirety, do not support a determination of unlawful discrimination based on disparate treatment.
Under "Conclusions of Law", the recommended order recites that "the petitioner bears the burden of proof in this case", citing McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The order states further, in paragraphs 27 and 28:
27. The Petitioner bears the burden of establishing a prima facie case of discrimination. See, McDonnell v. Douglas, [sic] supra. Once the Petitioner has established a prima facie case by a preponderance of the evidence, the Respondent must articulate some legitimate, nondiscriminatory reason for its actions. See, McDonnell-Douglas, [sic] supra. Once the Respondent has articulated a reason for its actions, the Petitioner must prove by a preponderance of the evidence that the Respondent's articulated reason was not the true reason, but was a pretext for discrimination. See, St. Mary's Honor Center v. Hicks, [509 U.S. 502], 113 S.Ct. [2742] 2747 [125 L.Ed.2d 407].
28. The Petitioner must prove that the reason articulated by the Respondent was false and that discrimination was the real reason for the Respondent's actions. See, St. Mary's Honor Center, [509 U.S. at 515-17], 113 S.Ct. at 2752. The foregoing federal standards have been adopted in Florida and are applicable to cases arising under Chapter 760, Florida Statutes. See, Harris [School Board of Leon County] v. School Board of Leon County [Hargis], 400 So.2d 103 (Fla. 1st DCA 1981).
The next paragraph, number 29, unmistakably articulates a finding of a prima facie case under the disparate treatment standard:

*927 29. It is undisputed in this case that the Petitioner met his burden of establishing a prima facie case showing by a preponderance of the evidence that his age was 63 at the time of submitting his application, that he was minimally qualified for the position, that he was not hired for the position, and that a person was hired for the position who was younger than he was.
Turning to the hearing officer's "Findings of Fact", the recommended order states in paragraph 19: "Ms. McCluskey-Titus assessed the applicants, looking for people who had degrees in student personnel, a relatively recent degree field, and people who were beginning a career in this area." Continuing, in paragraph 20, the hearing officer found: "Ms. McCluskey-Titus was looking for an applicant with experience as a dorm leader as an undergraduate, and a degree in college student personnel and a background in student affairs...."
The hearing officer concluded in paragraph 30, in keeping with his analysis under the disparate treatment model of proof: "The Respondent articulated a legitimate, nondiscriminatory reason for hiring Sara Steyer instead of the Petitioner, to-wit: Ms. Steyer's specific educational background and recent experience as a dorm leader and working in student affairs." (Emphasis added.) In the same paragraph, quoting FSU's brief apparently with approval, the order refers to Ms. Steyer's early "commitment to and involvement in" university student affairs and housing, which continued into her master's program, with two years of "direct experience" in university resident housing, contrasted to Sondel's only direct experience in student housing, "which lasted 14 months at a junior college, occurred in 1989, approximately 29 years after he received his masters degree."[2]
Under the controlling federal case law, as acknowledged by the hearing officer, once the employer has "met its burden of adducing a nondiscriminatory reason," St. Mary's Honor Center v. Hicks, 509 U.S. at 515, 113 S.Ct. at 2751, the employee must "`prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination,'" Id. at 515, 113 S.Ct. at 2751-52 (emphasis added), quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The Hicks opinion further explains that a reason cannot be a pretext for discrimination "unless it is shown both that the reason was false, and that discrimination was the real reason." 509 U.S. at 515, 113 S.Ct. at 2752.
There is no finding by the hearing officer that the "legitimate nondiscriminatory reasons" advanced by McCluskey-Titus were "false," or "a pretext for discrimination." Instead, in paragraph 34, the penultimate finding under "Conclusions of Law," the hearing officer found:
34. The process by which Ms. McCluskey-Titus filled the last six positions in the housing office with incumbents whose average age is 26.5 years is not invidious black-hearted discrimination, but a more subtle process of exclusion of individuals whose experience with student government affairs is 29 years old, and who is ending a *928 career and not beginning one, and whose degrees are more general.
Contrary to Sondel's arguments, we cannot "infer" a finding of pretext based upon a plain reading of the order. We cannot agree that a reason can be false, or pretextual, and at the same time "not invidious." This is particularly true in this case. Sondel testified that McCluskey-Titus told him, when he complained to her about the hiring decision, that "they were looking for young people" to fill the resident housing coordinator positions. Sondel, questioning McCluskey-Titus on direct examination at the hearing, asked her whether during his meeting with her she stated that "what you normally have in this selection process is young people, and that you really think of this job in terms of young persons." He added: "And that is my recollection. I am wondering if you would confirm that." McCluskey-Titus answered: "That is not the same recollection that I had." Later, on direct examination by FSU's counsel, she categorically denied telling Sondel that she was "looking only for young people in this position." She admitted that she told Sondel that the position was an "entry-level job" or words to that effect. She further affirmed that people whom she interviews, people who apply for the job, and people that get hired for the job are of a younger age group "because that is the only applicant pool that does generally apply for it." She explained:
The nature of this position is that the person lives in a university residence hall, is really responsible for things that happen within the residence 24 hours a day. The nature of this job, and the fact that for many this is a stepping stone, this is a first job. I don't know how to say this. This is the kind of people who apply, people who are of a younger age group more typically based on what I have seen face to face in interviews, based on what you can glean from a resume, that shows not a lot of work experience before receiving a Bachelor's or before receiving a Master's. That is the nature of the candidate pool for this position. (Emphasis added.)
The hearing officer made no finding that McCluskey-Titus made the statement that she was "looking for younger people." It is significant that Sondel phrased the question to McCluskey-Titus differently at the hearing, asking her whether she had said to him that "what you normally have in this selection process is young people," and that "you really think of this job in terms of young people." Paragraph 23 of the recommended order states: "Ms. McCluskey-Titus was aware that it would have been illegal to advise applicants that they were looking for young people." (Emphasis added.) This oblique reference to the matter of "looking only for young people" is inconsistent with the notion that McCluskey-Titus did give such advice to anyone, but rather suggests that she did not. In any event, there is no finding that the statement was made by McCluskey-Titus, and, contrary to arguments in Sondel's brief, there is no finding by the hearing officer that McCluskey-Titus was "looking for a younger person."
Finally, our review of the Commission's final order persuades us that the Commission applied an incorrect legal standard in ruling on FSU's exceptions to the hearing officer's ruling on the disparate treatment claim. In its exceptions to the recommended order, FSU argued and cited extensive authority to support its position that a finding of discrimination based on disparate treatment could not stand absent a rejection of the employer's proffered reasons for the hiring decision as false, and a pretext for discrimination. In response, the Commission's final order states: "We find that there is no requirement that the finder of fact specifically reject the proffered reasons before proceeding to the issue of whether discrimination occurred." (Emphasis added.) The statement is correct, in isolation, but it is not responsive to FSU's exceptions. The law is, that after proceeding to "the issue of whether discrimination occurred," the finder of fact must determine "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Hicks, 509 U.S. at 515, 113 S.Ct. at 2752. (Emphasis added.)
The Commission's error on this point is confirmed by the paragraph of its final order *929 following the above quoted sentence, which states:
The United States Supreme Court has recently stated, "Once the defendant `responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the fact finder must then decide' not... whether the evidence is credible, but `whether the rejection was discriminatory....'" St. Mary's Honor Center v. Hicks, [citation omitted].
This partial quotation does not stand for the proposition that the fact finder does not have to determine in a disparate treatment case whether the proffered reasons are credible, and to so interpret this excerpt from Hicks is a misreading of the opinion. The excerpt, as quoted in the final order, omits the critical language found immediately following the underlined word "not" in the Hicks opinion: "(as the dissent would have it)." 509 U.S. at 519, 113 S.Ct. at 2753. The major point of contention between the majority and the dissenting justices in Hicks was the contention by the dissenting justices that a plaintiff is required to prove only that the proffered reasons were false, whereas the majority contended, and so held, as pointed out above in this opinion, that the plaintiff is required to prove both that the reasons given were false and that discrimination was the "real reason" for the decision. Id. at 515-17, 113 S.Ct. at 2752.
The hearing officer's and the Commission's findings of unlawful discrimination, insofar as they rely upon a disparate treatment theory, are based on insufficient factual determinations and on a mistaken view of the law, and must be set aside. Florida Department of Community Affairs v. Bryant, 586 So.2d 1205, 1209 (Fla. 1st DCA 1991).

II.
Turning to the disparate impact aspects of the case, we agree with FSU's contention that the hearing officer in his recommended order stated the legal requirements of proof in a disparate treatment case, as above discussed, and adopted findings and conclusions relevant, if at all, to a determination of discrimination based upon disparate impact. We are mindful of the cautionary note found in our decision in Bryant, id., that the evidentiary standards found in McDonnell Douglas were not meant to be "an inflexible yardstick." Nevertheless, the two bases for liability for discrimination are very different, and the proof in disparate impact cases is entirely different. We are of the view that the disregard of these differences by the lower tribunal was a departure from the essential requirements of law.
The plaintiff charging disparate impact must meet a higher standard of proof than in disparate treatment cases. This factor weighed heavily in the Supreme Court's decision in Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827, 101 L.Ed.2d 827 (1988). In a case of first impression, the Court applied disparate impact analysis to subjective or discretionary employment practices, rejecting arguments by the employer that applying a disparate impact theory would have a "chilling effect" on legitimate business practices. 487 U.S. at 993, 108 S.Ct. at 2788. The Court first noted that the plaintiff's burden goes beyond the need to show that there are statistical disparities in the employer's work force. "The plaintiff must begin by identifying the specific employment practice that is challenged." Id. at 994, 108 S.Ct. at 2788. (Emphasis added.) The Court noted the greater difficulty in "isolating and identifying" the specific employment practices where the employer combines subjective employment criteria with objective tests or standards. Id. at 994-95, 108 S.Ct. at 2789.
Then, turning to causation, the Supreme Court in Watson noted that the plaintiff must present statistical evidence "of a kind and degree" sufficient to show that the practice in question "has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." Id. Further, such statistical disparities "must be sufficiently substantial that they raise such an inference of causation." Id.[3]
*930 A further constraint, the Court found, was in the nature of the "business necessity" or "job relatedness" defense, pointing out that the requirement of showing a "manifest relationship" to the employment in question does not have the effect of shifting the ultimate burden of proof to the defendant. Id. at 998-1000, 108 S.Ct. at 2791.
In further discussing the "job relatedness" requirement the Court referred to the decision in Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), which held that this requirement was satisfied when the employer demonstrated that a written test was related to success at a police training academy "`wholly aside from [the test's] possible relationship to actual performance as a police officer.'" Watson, 487 U.S. at 998, 108 S.Ct. at 2791 (quoting from Washington). The Court observed that an employer has an easier burden in defending subjective or discretionary employment decisions, and that many jobs "require personal qualities that have never been considered amenable to standardized testing." Id. In evaluating claims that discretionary employment practices are insufficiently related to legitimate business practices, the Court admonished that "it must be borne in mind that `[c]ourts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it.'" Id. (quoting from Fumco Construction Corp. v. Waters, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978). Finally, the Court concluded, "the high standards of proof in disparate impact cases are sufficient in our view to avoid giving employers incentives to modify any normal and legitimate practices by introducing quotas or preferential treatment." 487 U.S. at 999, 108 S.Ct. at 2791.
Our review of the decision below convinces us that the requirements of proof under the disparate impact analysis, and the higher burden imposed on the complainant, were not taken into account by the hearing officer and the Commission. Initially we note, as pointed out by FSU, that the charge of discrimination and petition for relief filed with the Commission by Sondel complained, in general terms, of FSU's "employment practices" in failing to hire persons over 40 years of age, but made no attempt to isolate and identify any specific employment practice that was being challenged. Moreover, at the hearing, Sondel in his opening statement made it clear that he was talking about "a decision" made by the University Housing Office. He continued: "I have not accused Florida State University of routine, continual, and habitual discrimination against anyone. I am saying, and I think this focus needs to be kept, that in what happened to me, there was discrimination. I don't mean to imply anything else as far as the university is concerned." In his post-hearing brief Sondel admitted that it was the hearing officer, at the hearing, who "raised the issue" regarding the setting of criteria by Ms. McCluskey-Titus "in such a way that older applicants are, automatically, prevented from even applying."
As recently as 1993, in Steele v. City of Lynn Haven, 16 FALR 2189 (FCHR 1993), the Commission had occasion to review the controlling law in disparate impact cases. In that case the Commission approved the hearing officer's recommended order which included the conclusion of law that "if the Petitioner is challenging the employment practice under the disparate impact theory of discrimination, Petitioner must allege a specific employment practice utilized by the employer and show through statistical evidence that the employment practice" had a disproportionate impact on a protected group. (Emphasis added.) Because FSU has not brought to our attention any motion or objection to evidence presented below on the ground that the pleadings failed to identify a specific employment practice being challenged, we find it unnecessary to further address the sufficiency of the pleadings to charge discrimination under a disparate impact theory. It is apparent, however, that the disregard for the specific requirements of pleading and proof contributed to the deficiencies in the order under review.
In order to establish a prima facie case of disparate impact in a hiring context, the plaintiff must: (1) identify the specific employment practice or selection criteria being challenged; (2) show a disparate impact by proving a pattern or practice of hiring *931 sufficiently different from that of the pool of qualified applicants; and (3) prove causation; that is, present statistical evidence of a kind and degree sufficient to show that the practice in question has in fact caused the exclusion of applicants for the job because of their membership in a protected group. Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 992-95, 108 S.Ct. 2777, 2788-89, 101 L.Ed.2d 827; Rose v. Wells Fargo & Co., 902 F.2d 1417, 1424 (9th Cir.1990).
Under the legal standards applicable to disparate impact claims, the record does not support the Commission's ultimate finding of discrimination. In a disparate treatment case, a plaintiff can make out a prima facie case merely by presenting evidence sufficient to give rise to an inference of discrimination. By contrast, in a disparate impact case, plaintiffs must "do more than merely raise an inference of discrimination before the burden shifts; they `must actually prove the discriminatory impact at issue.'" Garcia v. Spun Steak Company, 998 F.2d 1480, 1486 (9th Cir.1993) (quoting from Rose v. Wells Fargo & Co., 902 F.2d at 1421).
The evidence established, as the hearing officer found, that McCluskey-Titus historically has hired no applicant for the position of Resident Housing Coordinator over the age of 30, and that the average age of the last six persons hired for the position was 26.5 years. We agree, as urged by FSU, that these numbers alone do not establish a case of disproportionate impact. McCluskey-Titus testified that she has held her present position for eight years, during which time she has hired persons for one of the resident housing coordinator positions eight times. Sondel, however, presented no evidence of the ages of persons in the pool of applicants for the position on prior occasions, and demonstrated no comparison between the qualified applicant pool and the persons actually hired. This failure of proof, as stated in Edwards v. Wallace Community College, 49 F.3d 1517, 1520 (11th Cir.1995), defeats a disparate impact claim.
We concur, as Sondel argues, that statistics are not always necessary to establish a disproportionate impact. See, e.g., Watson v. Fort Worth Bank and Trust; Dothard v. Rawlinson, 433 U.S. 321, 329-31, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977); Thomas v. Washington County School Board, 915 F.2d 922 (4th Cir.1990); Carpenter v. Board of Regents of University of Wisconsin System, 728 F.2d 911(7th Cir. 1984). However, the kinds of cases in which statistical proof has been found unnecessary differ materially from this case. In Dothard, the Supreme Court stated that there is no requirement that a statistical showing of disproportionate impact "must always be based on analysis of the characteristics of actual applicants," noting that "[t]he application process might itself not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory." 433 U.S. at 330, 97 S.Ct. at 2727. In the case before us, there was no evidence that the application process discouraged any applicant from applying. Indeed, the only evidence on this point was testimony by McCluskey-Titus and her supervisors that the advertisements for the job opening, based on FSU policy, were restricted to the minimum qualifications for the position.
In Carpenter, in which a disparate impact claim in a racial discrimination case failed, the Seventh Circuit Court of Appeals acknowledged that a court may, "in an appropriate case, project a disparate impact from non-statistical evidence," but refused to "speculate" from certain employment practices that a racial effect would "necessarily have occurred" or "inevitably" result in proportionately fewer blacks receiving tenure. 728 F.2d at 914. In Thomas, the Fourth Circuit Court of Appeals found that although the plaintiff's statistical proof was inadequate, he had proved a case of disparate impact based upon the school board's practice of nepotism and the general practice of posting notices of vacancies only in the schools, which operated "invidiously" to discriminate on the basis of racial classifications in violation of Title VII. 915 F.2d at 925-26. There is no finding here that any practice of FSU operated "invidiously" to discriminate.
*932 Garcia v. Spun Steak Co. relied upon Sondel's brief among other cases, involved a claim of discrimination based on the employer's "English only" rule in the work place. The Ninth Circuit Court of Appeals noted that in the typical disparate impact case dealing with selection criteria used in hiring, the plaintiff proves discriminatory impact by showing statistical disparities between the number of members in the qualified applicant group and those in the relevant segment of the work force. "While such statistics are often difficult to compile," said the court, "whether the protected group has been disadvantaged turns on quantifiable data." 998 F.2d at 1486. When the alleged impact is on "conditions, terms, or privileges of employment," however, the determination of adverse effect "may depend on subjective factors not easily quantified." Id. Even so, the court stated: "The fact that the alleged effects are subjective, however, does not relieve the plaintiff of the burden of proving disparate impact." Id. Here, we are dealing with selection criteria used in hiring, and a showing of disadvantage typically depends upon quantifiable data which is absent here.
The cases relied upon by Sondel furnish no basis for relieving him of the necessity of providing statistical proof of the ages of the pool of applicants for prior vacancies in the resident housing coordinator position.[4] It is true that Sondel, himself, was a successful applicant for such a job at Chipola Junior College in 1989, and both he and one other applicant for the position at FSU were within the protected age group of the Age Discrimination in Employment Act. The uncontroverted testimony by Ms. McCluskey-Titus, however, establishes that the nature of the applicant pool for the position at FSU, if not elsewhere, is predominately younger persons in the early stages of their careers, willing to accept the entry-level compensation and the conditions of employment she described.[5]
The law in this area is clear that the plaintiff must isolate and identify the specific employment practices allegedly responsible for any observed statistical disparities. "For a plaintiff to show that there is an imbalance is not enough." MacPherson v. University of Montevallo, 922 F.2d 766, 771 (11th Cir.1991) (citing Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642, 657, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989)). "An adverse effect on a single employee, or even a few employees, is not sufficient to establish disparate impact." Massarsky v. General Motors Corp., 706 F.2d 111, 121 (3rd Cir.1983).
We conclude from our analysis that under the high standards of proof applicable, the evidence does not support a finding of disproportionate impact on older persons or a finding that any imbalance in the employment of older persons in the position in question was caused by discriminatory hiring practices utilized by FSU. In view of Sondel's failure to establish a prima facie case of disparate impact, the burden did not shift to FSU to defend its selection criteria by proving job relatedness. Furthermore, even if we assume a prima facie case was shown, FSU satisfactorily established job-relatedness.

III.
The hearing officer's recommended order contained no analysis, and made no finding, with regard to the requirement of proving a prima facie case under a disparate impact theory. Nevertheless, the hearing officer proceeded to find discrimination, apparently predicating that conclusion on FSU's policy of stating only the minimum job qualifications in its job announcement but allowing an employment decision to be based on qualifications viewed by the hiring official as exceeding the minimum requirements. The record before us does not support a claim of discrimination on that basis. Even *933 an employer's policy of leaving promotion decisions to the "unchecked discretion of lower level supervisors should itself raise no inference of discriminatory conduct." Watson, 487 U.S. at 990, 108 S.Ct. at 2786. It is clear that the decision here was made on the basis of the applicants' qualifications, and there is no finding disputing this. Furthermore: "When two applicants meet the minimum educational qualifications of a position, Title VII does not prevent an employer from preferring the applicant who has educational qualifications which surpass the minimum requirements of the position." Wileman v. Frank, 979 F.2d 30, 37 (4th Cir.1992).
Our own decision in Department of Corrections v. Chandler, 582 So.2d 1183 (Fla. 1st DCA 1991), adopts the pertinent case law which holds that "`[a]n employer's decision may be justified by the hired employee's superior qualifications unless the purported justification is a pretext for invidious discrimination.' " Id. at 1187 (quoting Fernandez v. Wynn Oil Co., 653 F.2d 1273, 1276 (9th Cir. 1981)). McCluskey-Titus testified that she made the hiring decision based upon her opinion that Ms. Steyer possessed superior qualifications, not the least of which was her commitment to a career in the student affairs profession, a factor which was found absent in Sondel's record.[6] There is no finding that this testimony was false, or that age was the motivating factor in preferring Steyer over Sondel. In fact, the hearing officer specifically found no "invidious" discrimination.
The hearing officer's findings of fact reveal several unsupported or irrelevant conclusions. For example, he found that McCluskey-Titus was "looking" for people who were "beginning a career" in the field of student personnel. From examination of her testimony, one could only reasonably conclude that her references to people "just beginning a career," and similar statements, were used in the context of describing the typical applicant, not as a criteria for the job.
The hearing officer described the degree in College Student Personnel as a "relatively recent degree field." Sondel's testimony was that if you look back three or four years "you wouldn't even find that title in most colleges and universities," adding that there are "all of these titles of degrees now which did not exist 20 or 30 years ago." He refused to acknowledge, on cross-examination, that it is a more specialized degree than a degree in Education, yet at the same time stated: "College Student Personnel, what is that? I don't even know what the description of that is." McCluskey-Titus, on the other hand, who possessed such a degree, testified that the degree had been available "[s]ince after World War II, mid 1940, 1950's."[7] Under any reasonable view of the evidence, the degree has been available for a considerable period of time; but more importantly, there was no evidence that candidates for the degree are limited to persons under the age of 40.[8] Furthermore, even if the "criteria" enumerated by the hearing officer may be "correlated with age," they are not, for that reason, discriminatory. Hazen Paper Company v. Biggins, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).
Although the hearing officer concluded that the "criteria" used by McCluskey-Titus "were not those developed by the employer on the basis of job related necessities," a reasonable view of the uncontroverted evidence presents a different picture. It is generally true, as McCluskey-Titus acknowledged, that one holding just about any kind of degree could be qualified for the job. She also explained, however, that the job does *934 entail a certain amount of specialized experience and education. She stated:
In fact, there is a program, a Master's program, in College Student Personnel that specially trains people for a career within student affairs, university housing being part of student affairs. There's a good bit of specializedwe have a whole philosophical base in university housing. We consider ourselves integral to the university mission, in that we support the academic mission of the university by providing educational opportunities for students outside the classroom within the residence halls. Some people like to think our position is kind of like house mothers that used to be in residence halls, but it is a specialized profession where people have knowledge and there are specialized skills that are really needed to be in these kinds of positions.
It appears self-evident that possession of a college degree designed to train a person for a career in college student affairs and personnel is related to the possibility of that person's success in the position described by McCluskey-Titus, wholly aside from a person's ability to perform the job without such a degree.[9]
We note also the hearing officer's finding that "McCluskey-Titus admitted that FSU did not have any mid-level career positions into which to promote these young people, and that this resulted in a high turnover of the employees who were hired in entry-level positions." It is difficult to understand the relevance of this finding to any of the issues presented. McCluskey-Titus testified that people who are interested in a career in student affairs will start their careers many times in residence halls, and that they will advance through the career ladder to the position of Dean of Students, or Vice President for Student Affairs. Her testimony was that the while the position is a "training program" for professionals, there is no "second-step" for them at FSU "within university housing."
The hearing officer's questions and comments at the hearing indicate his general dissatisfaction with FSU's practice of advertising a job opening based upon the minimum qualifications for the job, while allowing the actual hiring decision to be based upon more specific and preferred qualifications and experience considered relevant to the selectee's ability to carry out the university's mission. While we accept the premise that the employer's actions in this regard are not immune to challenge under the disparate impact theory, see Watson v. Fort Worth Bank and Trust, discussed at length above, we conclude that the Commission's order finding FSU guilty of unlawful discrimination is clearly erroneous and cannot be sustained on this record.[10]
As earlier noted, in view of our decision to reverse the order on appeal, we find it unnecessary to address the issues on cross-appeal.
The order on appeal is REVERSED.
BARFIELD, C.J., and KAHN, J., concur.
NOTES
[1] These sections are now part of the "Florida Civil Rights Act of 1992," sections 760.01 760.11, and 509.092, Florida Statutes (1995). The Act, as amended, was patterned after Title VII of the Civil Rights Acts of 1964 and 1991, 42 U.S.C. § 2000, et seq., as well as the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623. Federal case law interpreting Title VII and the ADEA is applicable to cases arising under the Florida Act. See Florida Department of Community Affairs v. Bryant, 586 So.2d 1205 (Fla. 1st DCA 1991).
[2] In his findings of fact, the hearing officer summarized Ms. Steyer's credentials as follows: "Ms. Steyer's experience included managing a residence hall for two academic years; serving as a resident assistant for three academic years; and experience while in school in student affairs and related areas, to include freshman orientation, fraternal organizations, and the University's judicial process. Ms Steyer received a master's degree from Bowling Green State University in student personnel management. The position at FSU was her first position after receiving her master's degree."

It should be noted that Sondel's resume disclosed extensive educational credentials and, as described by the hearing officer, a "varied career," summarized in the recommended order as follows: "The Petitioner's vitae indicates that he has a bachelor of arts in psychology and sociology, a master's in education, and had completed the course work for a doctorate in education at Florida State University. The Petitioner's work experience included teaching, speech, drama, history and reading; being a Principal; assisting in establishing a Job Corp training program; working overseas for the United Nations, the World Bank, and various U.S. agencies; coordinating the Energy Management Program of the Florida Department of Transportation; managing his own consulting business; and most recently was director of resident halls at Chipola Junior College for 14 months."
[3] See Watson, 487 U.S. at 994-95, 108 S.Ct. at 2789, for a list of cases variously describing the "sufficiently substantial" requirement.
[4] The files for applicants for prior openings were not produced at the hearing. There was testimony by Sondel that he was told these files had not been preserved. No notice to produce is in the record.
[5] McCluskey-Titus testified that she interviewed a "good number" of people at national conferences, pointing out that at the last conference she attended with Dr. Keith Jenkins, her assistant director, they interviewed 35 people, none of whom were 35 years of age. Further, she stated: "They were people right out of a Master's program. That is most typical of the candidates I have seen over eight years."
[6] McCluskey-Titus stated that it had been her experience in working with staff that those "who are committed to a career in housing or student affairs are committed to doing a good job at each level ... and tend to have done a good job with us." Other than Sondel's resident housing experience for 14 months at Chipola Junior College, McCluskey-Titus found nothing in his resume indicating any such commitment. The evidence disclosed, in fact, that Sondel's next job after leaving Chipola was at Dozier School, a state correctional facility located in the same county.
[7] Interestingly, at the hearing before the Commission, the chairperson, who voted not to sustain the finding of discrimination, observed that to her personal knowledge the degree had been offered for at least 25 years.
[8] The hearing officer himself suggested at one point in the hearing that many "older" persons embark on "new careers," giving as an example retirees from military service.
[9] On the issue of "job relatedness," see Washington v. Davis, 426 U.S. at 250-51, 96 S.Ct. at 2053, as quoted in Watson, 487 U.S. at 998, 108 S.Ct. at 2791.
[10] We note, in passing, that both the recommended order and the final order ambiguously command the university to "cease and desist" its "discriminatory practices," without identifying the specific practices enjoined.